**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| R. Prasad Industries, a Guyanese company, | ) ) ) | No. CV 12-8261-PCT-JAT |
| Plaintiff, | ) ) | **ORDER** |
| vs. | ) ) ) ) | |
| Flat Irons Environmental Solutions Corporation (aka/dba "Flatirons" Environmental Solutions Corporation"), an) Arizona corporation; Gary Miller and Jane Doe Miller, husband and wife; Robert Carlile (aka "Robert Carillo") and Jane Doe Carlile, husband and wife; James Keylon and Jane Doe Keylon, husband and) wife, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

Plaintiff filed a thirteen count Complaint (Doc. 1) against Defendants stemming from an alleged breach of contract. Pending before the Court is Defendants Flat Irons Environmental Solutions Corporation, Gary Miller and Jane Doe Miller, and Robert Carlile and Jane Doe Carlile's (collectively, "the Defendants")[1] Motion to Dismiss (Doc. 16) the entirety of Plaintiff R. Prasad Industries' thirteen count complaint against them pursuant to Federal Rule of Civil Procedure 12(b)(6). Alternatively, the Defendants move for a more

---

[1] Defendants James Keylon and Jane Doe Keylon are not parties to this Motion to Dismiss; counsel for the moving Defendants stated, "it is to be understood that the undersigned counsel does not represent the Keylon Defendants." (Doc. 16 at 9).

definite statement of the claims in the Complaint under Federal Rule of Civil Procedure 12(e). (*Id.* at 6-7, 21). The Court now rules on both motions.

## I.     BACKGROUND[2]

Plaintiff R. Prasad Industries ("Prasad"), a Guyanese company with its principal place of business in Corentyne, Berbice, Guyana, sells and distributes fertilizer to companies and business in Guyana and the Caribbean region of South America. (Doc. 1 at ¶¶ 1, 12). Defendant Flat Irons Environmental Solutions Corporation ("Flat Irons"), an Arizona corporation with its principle place of business in Prescott, Arizona, sources fertilizer globally and sells fertilizer as a wholesale supplier. (*Id.* at ¶¶ 2, 13). Defendants Gary Miller ("Miller") and Robert Carlile ("Carlile") are the two directors and shareholders of Flat Irons (Carlile is CEO and Miller has primary responsibility for operations) and, at all relevant times, represented themselves as acting on Flat Irons' behalf. (*Id.* at ¶¶ 3, 5). Defendant James Keylon ("Keylon"), at all relevant times, represented himself as Flat Irons' agent and was compensated based on the transactions between Prasad and Flat Irons. (*Id.* at ¶¶ 7, 15).

Having previously formed a relationship with Prasad (*id.* at ¶ 14), Keylon, acting as a compensated intermediary, introduced Prasad to Flat Irons in 2012 and represented Flat Irons as a "long-standing, reputable, reliable and dependable supplier of fertilizer . . . able to source all of Prasad's needs for fertilizer." (*Id.* at ¶¶ 14-15). In March 2012, Prasad contacted Carlile and discussed Prasad's current and future needs for sourced fertilizer; Carlile represented that Flat Irons could supply fertilizer to Prasad "with virtually any specifications [or] quantity." (*Id.* at ¶ 16). From March though August 2012, Prasad and Flat Irons successfully completed multiple small fertilizer transactions. (*Id.* at ¶ 17). In August 2012, Prasad informed Keylon that Prasad may soon enter into a large state contract in Guyana (with "Guysuco") and asked if Flat Irons would be interested and capable of sourcing the request; Keylon responded that Flat Irons "was fully capable of fulfilling such

---

[2] The facts from Prasad's complaint are taken as true for purposes of a motion under 12(b)(6). *See Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). Further, for the purposes of the Motion to Dismiss, Defendants do not appear to dispute any of these facts.

1    an order." (*Id.* at ¶ 17).

2        On August 31, Prasad informed Flat Irons of its impending large state contract with

3    Guysuco for 5,000 metric tons ("MT") of urea (a type fertilizer) meeting certain

4    specifications. (*Id.* at ¶ 19; *see id.* at Ex. A). Carlile then told Prasad that Flat Iron could

5    handle the large order, the urea would be sourced and shipped from Mexico, and "a sample

6    would be sent to Prasad for approval." (*Id.* at ¶ 20). On September 2, Carlile emailed Prasad

7    a "Quotation" for $1,890,000 for 5,000 MT of the specified urea. (*Id.* at ¶ 21; Ex. B). On

8    September 7, Carlile emailed Prasad an updated proposal for a "Total Contract Amount" of

9    $2,115,000, which included financing, shipping, and transportation charges. (*Id.* at ¶¶ 21-22;

10   Ex. C). Later on September 7, Prasad emailed a "Proposal for financing the supply of

11   5,000MT Urea" to Carlile at Flat Irons and indicated that Prasad would provide an advance

12   payment of $500,000. (*Id.* at ¶ 23; Ex. D).

13       On September 10, Carlile as CEO of Flat Irons, emailed a letter to Prasad stating "that

14   5,000 metric tons of urea" with "specifications per your request" was "available   for

15   immediate shipment from Mexico" and that a sample for Prasad's approval would be

16   forthcoming. (*Id.* at ¶ 24; Ex. E). On September 11, Prasad informed Flat Irons that the urea

17   specifications in the letter were incorrect. (*Id.* at ¶ 25). On September 12, 2012, Carlile

18   responded with the corrected specification and a 15 day delivery estimate. (*Id.* at ¶ 26; Ex.

19   F). On September 13, Prasad received and approved the sample of urea, telephoned Flat

20   Irons, "verbally accepted" the proposed contract, and explained that Prasad would remit the

21   down payment to Flat Irons "once the contract with Guysuco was signed." (*Id.* at ¶ 27).

22       On September 13, Prasad concluded the contract with Guysuco, notified Flat Irons via

23   email, requested that loading of the shipping containers begin, and noted that Prasad was in

24   the process of remitting the down payment. (*Id.* at ¶ 29; Ex. G). On September 14, Carlile

25   "instructed Prasad via telephone" to remit the $525,000 down payment as two wire transfers

26   of differing amounts to Miller's bank in California, purportedly so that Miller could use the

27   larger of the two wire amounts to pay the Mexican source of urea. (*Id.* at ¶ 30). On

28   September 19, Prasad complied with Carlile's request and remitted $525,000 to Miller, but

the funds were never used to pay the Mexican source of urea.  (*Id.* at ¶ 31; Ex. H).

On September 24, Prasad inquired about the status of the urea shipment and Carlile responded that he was "[w]orking on it this morning."  (*Id.* at ¶ 32; Ex. I).  On September 25, Carlile emailed Prasad claiming that due to Flat Irons' inability to timely obtain a letter of credit for the Mexican urea, Carlile cancelled loading of the shipment.  (*Id.* at ¶ 33; Ex. J). Additionally, Carlile claimed that because of a rising market price for urea, Carlile would now have to source urea "able to ship immediately" from China at a higher price than previously agreed.  (*Id.*).  Prior to receiving this email, Prasad had not been told that supply from the Mexican source of urea would be contingent upon Flat Irons' securing a letter of credit and Flat Irons never explained why it was no longer able to source the urea from Mexico.  (*Id.* at ¶¶ 34-35).  Prasad never agreed to accept urea from China.  (*Id.* at ¶ 34).

Later on September 25, Prasad emailed Carlile asking for details about Flat Irons' proposed shipment of Chinese urea, but Carlile never answered Prasad's questions.  (*Id.* at ¶ 36; Ex. K).  On September 26, Carlile emailed Prasad claiming that Miller was in China "overseeing the shipment of [u]rea," had paid workers overtime to "expedite the process," "will send [the] requested documents this evening," and had dispatched a sample of the urea for Prasad's approval.  (*Id.* at ¶ 37; Ex. L).  Miller, however, was not in China at that time. (*Id.* at ¶ 38).  On September 26 and 27, Prasad continued to request that Flat Irons provide copies of the shipping documents for the purported Chinese urea shipment (*Id.* at ¶ 39; Ex. M), and, in multiple telephone conversations, Keylon assured Prasad that Flat Irons' would uphold the terms of the contract with Prasad (*Id.* at ¶ 40).

Later on September 27, Prasad asked several more questions regarding the Chinese shipment and informed Flat Irons that Guysuco was demanding shipping information.  (*Id.* at ¶ 41; Ex. N).  In response, Carlile claimed Miller was incommunicado at the Chinese factory, but understood the urgency of remitting the shipping documents.  (*Id.*).  Even later on September 27, Miller emailed Prasad a lengthy explanation claiming that "[b]ecause the money was late from Guyana," Flat Irons had been scrambling to expeditiously ship the Chinese urea and that only 1,400 MT of the 5,000MT ordered by Prasad would be at the port

"sometime this coming week"; Miller did not include any of the requested shipping documents. (*Id.* at ¶ 42; Ex. O).  On September 28, Carlile emailed Prasad three "random, stock photographs that were copied and pasted from the internet," but claimed they were taken by Miller at the Chinese urea warehouse.  (*Id.* at ¶¶ 44-45; Ex. P).  On October 2, Prasad again requested shipping documents.  (*Id.* at ¶ 46; Ex. Q).

On October 3, Carlile emailed Prasad a contract purporting to be between Flat Irons and the Chinese urea supplier, acknowledged receipt of $525,000 from Prasad, and claimed that 1,400 MT of urea would arrive "at the end of October."  (*Id.* at ¶ 47; Ex. R).  Becuase Prasad had neither received the promised Chinese urea sample nor "approved the switch from the Mexican to a Chinese supplier" (*id.* at ¶ 48), on October 4 Prasad emailed Flat Irons asking "[h]ow are we doing with the contract?" (*id.* at ¶ 49; Ex. S).  On October 4, 5, and 6, Keylon repeatedly telephoned Prasad and promised that the Chinese urea would meet Prasad's specifications.  (*Id.* at ¶ 50).

On October 8, Prasad again emailed Flat Irons asking for the shipping documents for the Chinese urea; Carlile responded that "[e]verything is on track. . . . China . . . will get me the shipping docs."  (*Id.* at ¶ 51; Ex. T).  Later on October 8, Prasad received a sample of the Chinese urea and immediately notified Flat Irons that it did not meet the required specifications.  (*Id.* at ¶ 52; Ex. U).  On October 9, Carlile emailed Prasad a stock photo claiming it depicted a conforming sample that Carlile was sending.  (*Id.* at ¶ 53; Ex. V).  On October 10, Miller emailed Prasad four more stock photographs claiming they were photos of the urea.  (*Id.* at ¶¶ 54-55; Ex. W).

On October 11, Prasad sent a letter to Flat Irons "terminating the agreement with Flat Irons" and requesting "an immediate return of the $525,000 deposit that Prasad had wired to Flat Irons" so that Prasad could "find a reliable supplier to fulfill [its] obligations and commitments timely to Guysuco."  (*Id.* at ¶ 56; Ex. X).  On October 15, Miller emailed Prasad acknowledging that the Chinese urea was delayed and proposing an alternate shipment from Suriname.  (*Id.* at ¶ 57; Ex. Y).  On October 16, Keylon telephoned Prasad and told Prasad that the Chinese deal could be saved, but this attempt to resuscitate the deal

failed when Flat Irons refused to provide the requested shipping information.  (*Id.* at ¶ 58).

Prasad retained Guyanese counsel, repeatedly requested a refund from Flat Irons, and, on November 2, at Keylon's suggestion, flew to Arizona in a failed attempt to personally negotiate a partial refund.  (*Id.* at ¶¶ 59-66; Exs. Z-BB).  Prasad then retained Phoenix counsel and demanded an immediate refund of the $525,000 advance payment.  (*Id.* at ¶ 66; Ex. CC).  All Defendants ignored Prasad's refund requests.  (*Id.* at ¶ 68).  Because Flat Irons failed to source the urea and refused to refund Prasad's $525,000 advance payment, Prasad failed to meet its contractual obligations to Guysuco and defaulted on its security bond.  (*Id.* at ¶ 69).  Guysuco sued Prasad and Prasad's "business has been virtually destroyed."  (*Id.*).

On December 30, 2012, Prasad filed a thirteen count Complaint (Doc. 1) against Defendants based on the above facts:[3] (1) Flat Irons is in "material breach of contract under Arizona contract law and [in] violation of A.R.S. § 47-2301" for failing to "perform [their] obligations under [an] express contract with" Plaintiff (*id.* at ¶ 75); (2) Flat Irons breached "the covenant of good faith and fair dealing" that is "implied in every contract" (*id.* at ¶¶ 78, 80); (3) Miller, Carlile, and Keylon aided and abetted Flat Irons' "breaches of contract and violations of A.R.S. § 47-2301 (*id.* at ¶ 84); (4) Miller, Carlile, and Keylon aided and abetted Flat Irons' "breaches of its implied covenants of fair dealing and good faith" (*id.* at ¶ 86); (5) Flat Irons, Miller, and Carlile "converted Prasad's funds" by "misus[ing] and misappropriat[ing] [the funds] for their own use and benefits" (*id.* at ¶ 89); (6) all Defendants were and "continue[] to be a constructive trustee and hold [Prasad's funds] in constructive trust for [Prasad]" under "both Arizona common law and A.R.S. § 13-2314.04(D)(6) (*id.* at ¶ 94); (7) all Defendants "have been unjustly enriched to [Prasad]'s detriment" under Arizona

---

[3] The Court notes that Prasad's Complaint contains 70 paragraphs of factual allegations (Doc. 1 at 1-15) providing greater specificity than the abbreviated recitation above and includes 29 separate exhibits—emails and other documents between Prasad and various Defendants (*id.* at Exs. A-CC)—supporting the alleged facts.  Additionally, Prasad's Complaint consistently alleges that, "upon information and belief," Keylon, Miller, and Carlile knew their various representations to Prasad were "false and intended to deceive Prasad."  (*Id.* at ¶¶ 18, 20, 24, 30-32, 38, 40, 43, 45, 47, 50-51, 53, 55, 57).

law (*id.* at ¶ 99); (8) all Defendants' "false, fraudulent and material misrepresentations, omissions and non-disclosures of material information . . . constitute common law fraud" entitling Prasad to relief under A.R.S. § 47-2721 (*id.* at ¶ 103); (9) all Defendants' "false, fraudulent and material misrepresentations, omissions and non-disclosures of material information . . . constitute" statutory fraud under A.R.S. § 13-2310 and/or "consumer fraud" under A.R.S. §§ 44-1521, *et seq.* (*id.* at ¶ 105); (10) Miller, Carlile, and Keylon engaged in a civil conspiracy "to accomplish one or more of the unlawful purposes alleged herein" (*id.* at ¶ 109); (11) all Defendants tortiously interfered with Prasad's "existing contractual relationships with" a third party (*id.* at ¶ 113); (12) all Defendants "unlawfully conspired to violate the provisions of 18 U.S.C. § 1962(a), (b) or (c)" of the "RICO" Act (*id.* at ¶ 119); and (13) Miller, Carlile, and Keylon[4] violated "the Arizona Racketeering Act ('AZRAC')," A.R.S. §§ 13-2301, *et seq.*, by engaging in the "acts and omissions alleged herein" (*id.* at ¶ 124).

## II.    LEGAL STANDARD FOR A 12(b)(6) MOTION

To survive a 12(b)(6) motion for failure to state a claim, a complaint must meet the requirements of Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief," so that the defendant has "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Also, a complaint must contain sufficient factual matter, which, if accepted as true, states a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

---

[4] The heading for this count states "all Defendants," but the Court notes that in the paragraphs supporting the count, Prasad refers only to actions committed by either "Miller, Carlile, and Keylon" or "these Defendants," and not to "Flat Irons" or "all Defendants." (Doc. 1 at ¶¶ 123-128; *compare* Count 13 *with* Count 12 (identifying "Flat Irons, a corporation, and/or each of the individual Defendants" (*id.* at ¶ 121)). Consequently, the Court will treat Count Thirteen as alleging a cause of action against only Miller, Carlile, and Keylon.

Although a complaint attacked for failure to state a claim does not need detailed factual allegations, the pleader's obligation to provide the grounds for relief requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted).  Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief.  Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Id.* (citing 5 C. Wright & A. Miller, Federal Practice and Procedure §1202, pp. 94, 95 (3d ed. 2004)).  Thus, Rule 8's pleading standard demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (2009) (citing *Twombly*, 550 U.S. at 555).

In deciding a motion to dismiss under Rule 12(b)(6), the Court must construe the facts alleged in the complaint in the light most favorable to the drafter of the complaint and the Court must accept all well-pleaded factual allegations as true.  *See Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).  Nonetheless, the Court does not have to accept as true a legal conclusion couched as a factual allegation.  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## III.   CLAIMS IN THE COMPLAINT

### A.   Mrs. Miller, Mrs. Carlile, and Mrs. Keylon are Properly Named as Defendants

The Defendants argue that Jane Doe Miller, Jane Doe Carlile, and Jane Doe Keylon are improperly named as defendants in the Complaint because "the same claims" brought against Mr. Miller, Mr. Carlile, and Mr. Keylon have been brought against their unknown "spouses without any factual basis" (Doc. 16 at 21; *see, e.g.*, *id.* at 7, 15, 18) and the "spouses had no involvement with [Prasad]" (*id.* at 19).  Although the spouses are not alleged to have committed or even been aware of the actions alleged in the Complaint (*see* Doc. 24 at 2-3), under Arizona law, spouses must be sued jointly in order to reach assets of community property.  *See* A.R.S. § 25-215(D); *Spudnuts, Inc. v. Lane*, 676 P.2d 669, 670 (Ariz. Ct. App.

1    1984) ("if a plaintiff wants to hold a marital community accountable for an obligation, both

2    spouses must be sued jointly").  Accordingly, Prasad has properly named Jane Doe Miller,

3    Jane Doe Carlile, and Jane Doe Keylon as defendants.

4                    **B.    Count One (Breach of Contract and Violations of A.R.S. § 47-2301
                            by Flat Irons) Sufficiently Alleges an Enforceable Contract and
5                            Does Not Fail Due to the Statute of Frauds**

6           The Defendants argue that the "alleged contract is invalid under Arizona's enactment

7    of the Statute of Frauds, A.R.S. § 47-2201," because Prasad's Complaint does not include

8    a copy of a written and signed contract and Prasad has not specifically claimed that "the

9    requirement for a signature is waived or excused."  (Doc. 16 at 7-8).

10          Arizona's statute of frauds provides that a contract "for the sale of goods for the price

11   of five hundred dollars or more is not enforceable . . . unless there is some writing sufficient

12   to indicate that a contract for sale has been made between the parties and signed by

13   [defendant]."  A.R.S. § 47-2201(A).  "A contract for sale," however, "need not contain all

14   material terms and that such material terms as are included need not be precisely stated.  The

15   writing need only afford a basis for believing that offered oral evidence rests on a real

16   transaction."  *Koenen v. Royal Buick Co.*, 783 P.2d 822, 826 (Ariz. Ct. App. 1989).  "Courts

17   have consistently held that the statute of frauds is satisfied so long as the writing evidences

18   a contract for the sale of goods, is signed by the party against whom enforcement is sought,

19   and specifies a quantity."  *Id.*

20                    **1.    Prasad's Complaint Sufficiently Alleges that the Statute of
                            Fraud's Writing Requirement is Satisfied**
21
22          Prasad's Complaint provides numerous emails and letters between Flat Irons[5] and

23   Prasad containing terms specifying quantity, price, product specifications, financing, and

24   shipping.  (*See, e.g.*, Doc. 1 at Exs. A-E).  Under Arizona law, "the requisite writing need not

25   be in a single document."  *Hall v. World Sav. & Loan Ass'n*, 943 P.2d 855, 864 (Ariz. Ct.

26   App. 1997).  Moreover, Prasad alleges that, in response to Prasad's request, Flat Irons

27   _____

28          [5] Including emails from Miller and Carlile purporting to be on behalf of Flat Irons.

provided a written bid and proposal on Flat Irons' letterhead.  (Doc. 1 at ¶ 19-22; *id.* at Exs. A-C; Doc. 24 at 3).  While the bidding process alone does not create a contract, a bid ripens into a contract once it is voluntarily accepted by the offeree.  *AROK Const. Co. v. Indian Const. Services*, 848 P.2d 870, 873 (Ariz. Ct. App. 1993).  Here, Prasad's writings (*see, e.g.*, Doc. 1 at Ex. D) and advance payment in accordance with Flat Irons' written financing terms indicate an acceptance of the bid.  Accordingly, Prasad's Complaint sufficiently alleges that writings exist to demonstrate the existence of an enforceable contract and satisfy Arizona's statute of frauds.

> **2.      Prasad's Complaint Sufficiently Alleges that the Statute of Fraud's Signature Requirement is Satisfied**

Prasad's Complaint provides numerous emails and letters between Flat Irons[6] and Prasad containing evidence of Flat Irons' signature. (*See, e.g.*, Doc. 1 at Exs. B, E, J, L, O-P, R, V, Y).  Under Arizona law, "a writing is 'signed' in accordance with the statute of frauds if it is signed by the person to be charged by any of the known modes of impressing a name on paper, namely, by writing, printing, lithographing, or other such mode, provided the same is done with the intention of signing." *Bishop v. Morell*, 353 P.2d 1022, 1025 (Ariz. 1960) (holding that a mimeographed real estate listing, at the bottom of which appeared the name of the owner "in mechanical print," was a sufficient signature to satisfy the statute of frauds); *see also Haywood Securities, Inc. v. Ehrlich*, 149 P.3d 738, 740, ¶¶ 12-13 (Ariz. 2007).  Thus, Flat Irons' bid (Doc. 1 at Ex. B) could satisfy the signature requirement of the statute of frauds if Flat Irons intended its use of its letterhead to indicate an intent to sign the bid. Although Prasad's Complaint did not specifically allege that the letterhead indicated intent to sign the bid, the Court finds that the context provided by Prasad's other allegations—especially Flat Irons' subsequent letter informing Prasad that 5,000 MT of urea were ready for immediate shipment to Guyana—sufficiently alleges that Flat Irons' intended to be bound by its bid, and therefore that the use of letterhead could indicate such an intent.

---

[6] Including emails from Miller and Carlile purporting to be on behalf of Flat Irons.

1    Even if the Flat Irons letterhead did not indicate an intent to sign any of the documents

2    upon which it was printed, the other writings offered in Prasad's Complaint provide

3    alternative grounds for finding that Flat Irons' has satisfied the signature requirement of the

4    statute of frauds.  For example, Prasad's Complaint includes a letter signed by Carlile as

5    CEO of Flat Irons that discusses the quantity, shipping, and product specification terms of

6    the alleged contract.  (Doc. 1 at Ex. E).  Additionally, Carlile and Miller included an

7    electronic signature in some of the emails that could constitute the written contract (Doc. 1

8    at Exs. J, L, O-P, R, V, Y) and such "electronic signatures satisf[y] *any law* that requires a

9    signature."  A.R.S. § 44-7007 (emphasis added).  Because "any law" includes the statute of

10   frauds, the electronic signatures satisfy the signature requirement of the statute of frauds.  *See*

11   *Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1362 (Fed. Cir. 2005) (there is "no question of [an

12   email signature's] sufficiency under the Statute of Frauds because the Uniform Electronic

13   Transactions Act, Cal. Civ.Code § 1633.7 (2004),[7] provides that a 'record or signature may

14   not be denied legal effect or enforceability solely because it is in electronic form'").

15   Accordingly, Prasad's Complaint sufficiently alleges that the signature requirement of the

16   statute of frauds is satisfied.

17       Because the Court has found that Prasad's Complaint alleges facts sufficient to satisfy

18   the statute of frauds, the Court need not consider Prasad's alternative arguments that Flat

19   Irons' alleged conduct and/or Prasad's partial performance estop Flat Irons from invoking

20   the statute of frauds as a defense.  (Doc. 24 at 5).  Accordingly, Count One of Prasad's

21   Complaint will not be dismissed.

22           **C.    Count Two (Breach of Implied Covenant of Good Faith and Fair
                      Dealing by Flat Irons) Sufficiently States a Claim for Relief**

23

24       The Defendants argue that Flat Irons could not have violated an implied covenant of

25   good faith and fair dealing because "no enforceable contract is alleged in the Complaint" and,

26   alternatively, "the Complaint fails to allege that Flat Irons committed any act that prevented

27       ────────────────────────

28   [7] At least insofar as is relevant here, California's statute, Cal. Civ. Code § 1633.7, appears to be functionally identical to A.R.S. § 44-7007.

1  Prasad from benefitting from the alleged contract." (Doc. 16 at 7-8). Defendants' first

2  argument fails because, as explained above, Prasad's Complaint sufficiently alleges that an

3  enforceable contract exists.

4      Regarding the Defendants' second argument, the Defendants and Prasad agree (Doc.

5  16 at 8; Doc. 24 at 5-6) that Arizona law implies a covenant of good faith and fair dealing

6  in all contracts. *Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986) (citations omitted).

7  The contractual relationship gives rise to the duty, and the duty's essence "is that neither

8  party will act to impair the right of the other to receive the benefits which flow from their

9  . . . contractual relationship." *Id.* (citations omitted). There are generally two ways a party

10  can violate the covenant of good faith: either (1) "by exercising express discretion in a way

11  inconsistent with a party's reasonable expectations," or (2) "by acting in ways not expressly

12  excluded by the contract's terms but which nevertheless bear adversely on the party's

13  reasonably expected benefits of the bargain." *Bike Fashion Corp. v. Kramer*, 46 P.3d 431,

14  435, ¶ 14 (Ariz. Ct. App. 2002) (citing *Wells Fargo Bank v. Ariz. Laborers, Teamsters &*

15  *Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 28, ¶¶ 66-67 (Ariz. 2002)).

16  "Acts in accord with the terms of one's contract cannot without more be equated with bad

17  faith." *Wells Fargo Bank*, 38 P.3d at 30, ¶ 65 (citation and internal quotation omitted).

18      Here, Prasad alleges that Flat Irons is in the business of sourcing fertilizer for its

19  customers (Doc. 1 at ¶ 30) and that the alleged contract was formed for the express purpose

20  of Flat Irons sourcing urea of certain specifications for Prasad to resell to Guysuco in Guyana

21  at a specified time and for a profit (*see, e.g.*, *id.* at ¶¶ 17-23; Exs. A-D). Although Prasad's

22  allegations do not use the legal terms of art quoted above, Prasad's Complaint clearly alleges

23  facts that demonstrate Flat Irons used its discretion to choose a source of conforming urea

24  in a method inconsistent with Prasad's reasonable expectations. As one example, Prasad

25  alleges that Flat Irons "fail[ed] and/or refus[ed] to take the necessary action to perform its"

26  contractual obligations (*id.* at ¶ 79)—such as timely delivering conforming urea—by

27  "knowingly and intentionally terminat[ing] the contract with" the Mexican urea supplier (*id.*

28  at ¶ 35) and instead seeking urea in China that would not satisfy Prasad's reasonable

1    expectations of timely delivery (*see, e.g.*, *id.* at ¶¶ 36-37, 42; Exs. K-L, O).

2        Accordingly, the Court finds that Prasad has alleged facts sufficient to state a claim

3    that Flat Irons has breached the implied covenant of good faith and fair dealing.  Therefore,

4    Count Two of Prasad's Complaint will not be dismissed.

5              **D.    Count Three (Aiding and Abetting Flat Irons' Breaches of Contract**
                       **and Violations of A.R.S. § 47-2301 by Miller, Carlile, and Keylon)**
6                      **Fails to State a Valid Claim for Relief**

7        The Defendants argue that "there is no viable cause of action for aiding and abetting

8    a breach of contract" because "aiding and abetting claims are limited to aiding and abetting

9    another's tortious acts."  (Doc. 16 at 10).

10       "Arizona recognizes aiding and abetting as embodied in Restatement § 876(b), that

11   a person who aids and abets a tortfeasor is himself liable for the resulting harm to a third

12   person."  *Wells Fargo Bank*, 38 P.3d at 23, ¶ 31.  A claim of aiding and abetting tortious

13   conduct necessarily requires that "the primary tortfeasor  must commit a tort that causes

14   injury to the plaintiff."  *Id.* at 23, ¶ 34.  A breach of contract is not a tort and Prasad has

15   provided no authority—and the Court has found none—recognizing a cause of action for

16   aiding and abetting a breach of contract.  *See Montogmery v. Aetna Plywood, Inc.*, 231 F.3d

17   399, 413 n.6 (7th Cir. 2000) (finding no authority recognizing a cause of action for aiding

18   and abetting a breach of contract).

19       In response, Prasad tangentially argues that its "allegations are sufficient for a viable

20   claim of [Miller and Carlile]'s personal liability for the loss resulting from [Flat Irons']

21   breach."  (Doc. 24 at 6) (citation omitted).  Even if true, Prasad's argument does not explain

22   how alleging a breach of contract can satisfy the requirement that an underlying tort exist.

23   Because there is no underlying tort, Prasad's claim that Miller, Carlile, and Keylon aided and

24   abetted Flat Irons' breach of contract fails as a matter of law.  Accordingly, the Court grants

25   the Defendants' Motion to Dismiss Count Three of the Complaint.

26             **E.    Count Four (Aiding and Abetting Flat Irons' Bad Faith by Miller,**
                       **Carlile, and Keylon) Insufficiently States a Claim for Relief**
27

28       The Defendants argue that "no cause of action exists for aiding and abetting . . .

breaches of contractual duties such as the covenant of good faith asserted in [C]ount [F]our." (Doc. 16 at 10).  A breach of the duty of good faith and fair dealing, however, is a tortious act.  *Young v. Liberty Mut. Group, Inc.*, No. 12-cv-8261, 2013 WL 840618, at *3 (D. Ariz. Mar. 4, 2013) (citing  Restatement (Second) of Torts § 876 cmt. a. (1977)).  Therefore, a cause of action exists.

The Defendants also argue that Prasad "has not alleged [that] Miller and Carlile acted with the requisite scienter or that either one substantially assisted or encouraged Flat Irons to breach its duties."  (Doc. 16 at 10).  Under Arizona law, a claim of aiding and abetting tortious conduct requires three elements: "(1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach."  *Wells Fargo Bank*, 38 P.3d at 23, ¶ 34.

Here, Prasad satisfies the first element because Prasad has clearly and sufficiently alleged that Flat Irons, as the primary tortfeasor, caused injury to Prasad through the tort of "bad faith."  (Doc. 1 at ¶ 86; *see id.* at 18, Count 2).  Prasad satisfies the second element, scienter, because Prasad has clearly and sufficiently alleged that Miller and Carlile "intentionally, willfully, maliciously, wantonly and recklessly disregarded . . . Prasad's rights."  (*Id.* at ¶ 86; *see id.* at ¶¶ 18, 20, 24, 30-32, 38, 40, 43, 45, 47, 50-51, 53, 55, 57).

Prasad's satisfaction of the third element, however, is much less clear. "[S]ubstantially assist[ing] or encourag[ing] the primary tortfeasor in achievement of the breach," *Wells Fargo Bank*, 38 P.3d at 23, ¶ 34, requires the secondary tortfeasor to have committed a separate tortious act in concert with the primary tortfeasor.  *Young*, 2013 WL 840618, at *2-3; *see* Restatement (Second) of Torts § 876 cmt. a. ("Whenever two or more persons commit tortious *acts in concert*, each becomes subject to liability for the acts of the others, as well as for his own acts.") (emphasis added).  Therefore, to sustain its claim, Prasad must allege that Miller and Carlile committed an independent tortious act that substantially assisted or encouraged Flat Irons' "bad faith."

Defendants argue that Miller and Carlile could not have aided and abetted Flat Irons "bad faith" because Miller and Carlile made no individual acts.  (Doc. 16 at 9-10).  Rather, because Flat Irons, a corporation, "can act only through its officers and employees," Miller and Carlile's acts, made within the scope of their employment, are legally "the act of omission of the corporation."  *Id.* (citing *Southern Union Co. v. Southwest Gas Corp.*, 165 F.Supp.2d 1010, 1038 (D. Ariz. 2001) ("[w]here an officer is acting on behalf of the corporation, he is for all practical purposes the corporation") (internal quotations and citation omitted)).  Prasad appears to accept the Defendants' argument that corporations can only act through their employees,  but nonetheless argues that Miller and Carlile's actions, as officers of Flat Irons, caused Flat Irons' "bad faith" and therefore subject Carlile and Miller to personal liability for the tort.  (Doc. 24 at 6-7).  Prasad's argument is one of primary liability, not secondary liability.  It ignores that, to the extent that Miller and Carlile were acting *as* Flat Irons rather than *in concert with* Flat Irons, Miller and Carlile's actions cannot aid and abet Flat Irons' bad faith.  *Gibson–Jones v. Berkel & Co. Contractors, Inc.*, 2008 WL 782568, at *5 (N.D. Cal. 2008) ("[A] single actor (as a matter of legal tautology) cannot aid and abet (or conspire with) itself."); *see Wells Fargo Bank*, 38 P.3d at 23, ¶ 36 ("aiding and abetting is a theory of secondary liability").

Prasad has failed to identify which, if any, of Miller, Carlile, or Keylon's separate actions aided and abetted Flat Irons' alleged "bad faith."  Consequently, the Court finds that Count Four falls short of the Rule 8 pleading requirements and, therefore, is insufficient to state a claim.  Accordingly, the Court grants the Defendants' Motion to Dismiss Count Four of the Complaint.

### F.   Count Five (Conversion by Flat Irons, Miller, and Carlile) Sufficiently States a Claims for Relief

The Defendants argument to dismiss Count Five, in its entirety, states: "As explained above,[8] [Prasad]'s Complaint fails to allege sufficient facts to support a claim extending to

---

[8] The Court construes "as explained above" as referring to the immediately preceding argument against Counts Three and Four: that Miller and Carlile were acting as officers or

1    individual Defendants Miller, Mrs. Millers [sic], Robert Carlile, and Mrs. Carlile."[9]  (Doc.

2    16 at 11).  The Court notes that Defendants have only challenged Prasad's conversion claim

3    against Miller and Carlile,[10] not Flat Irons.  Accordingly, the Court accepts Count Five as

4    sufficiently pleaded to state a claim of conversion against Flat Irons.

5         Here, Prasad alleges that Miller and Carlile are the two directors and shareholders of

6    Flat Irons (Carlile is CEO and Miller has primary responsibility for operations) and, at all

7    relevant times, represented themselves as acting on Flat Irons' behalf.  (*Id.* at ¶¶ 3, 5).  Under

8    Arizona law, "if any principal knew of the actionable [conversion] and acquiesced in it, they

9    might be personally liable."  *Dawson v. Withycombe*, 163 P.3d 1034, 1051, ¶ 45 (Ariz. Ct.

10   App. 2007) (citing *Bischofshausen, Vasbinder, and Luckie v. D.W. Jaquays Mining and*

11   *Equip. Contractors Co.*, 700 P.2d 902, 908–09 (Ariz. Ct. App. 1985) (corporate directors can

12   be personally liable for torts committed by a corporation or an officer by virtue of their office

13   if they "have knowledge amounting to acquiescence")).  Prasad clearly alleges that Miller

14   and Carlile had "knowledge amounting to acquiescence" of the acts underlying the

15   conversion claim against Flat Irons because Prasad alleges that Miller and Carlile were the

16   employees of Flat Iron who committed the acts.  (*See, e.g.*, Doc. 1 at ¶¶ 30-31, 56; Exs. H,

17   X).  Indeed, the Defendants, themselves, appear to argue that Miller and Carlile's alleged

18   actions were on behalf of Flat Irons.  (Doc. 16 at 9-10).  Consequently, the Court finds that

19   _____

20   employees of Flat Irons within their scope of authority.  (Doc. 16 at 9-10).

21        [9] In the Defendants' Reply, instead of elaborating on how the Complaint's factual
     allegations insufficiently support a claim of conversion against Miller and Carlile, the
22   Defendants fill two pages arguing that Prasad's Response advances a "new allegation" (that
     the "$500,000 deposit . . . went directly into [Miller's] personal bank account" (Doc. 24 at
23   7-8)) neither present in nor consistent with the Complaint.  (Doc. 25 at 7-9).  The Court notes
     that the Complaint is ambiguous on this allegation.  (*See* Doc. 1 at ¶¶ 30-31; Ex. H).  Because
24   the Court finds that Prasad has alleged sufficient facts to sustain Prasad's conversion claim
     against Miller and Carlile on grounds unrelated to who has been alleged to own the
25   California bank account, the Court need not resolve this ambiguity at this time.

26

27        [10] As explained above, Prasad has properly named Jane Doe Carlile and Jane Doe
28   Miller as defendants wherever a claim has been properly made against their husbands.

Prasad has alleged sufficient facts to support holding Miller and Carlile personally liable for Flat Irons' alleged tort of conversion against Prasad.

Accordingly, the Court finds that Prasad has alleged facts sufficient to state a claim of conversion against Flat Irons, Miller, and Carlile.  Therefore, Count Five of Prasad's Complaint will not be dismissed.

### G.   Count Six (Constructive Trust of All Defendants) is a Remedy for Which Prasad May Be Entitled

The Defendants primarily argue that "a constructive trust is a remedy," not a cause of action, and therefore because "the Complaint does not arise after any Defendants have been held liable for a racketeering claim, no trust is yet established and [Prasad's] claim that Defendants are involuntary trustees [is] not ripe or based on sufficient factual allegations." (Doc. 16 at 11-12; *see* Doc. 25 at 9).  Although Prasad's Complaint may be unclear (*see* Doc. 1 at ¶¶ 92-95), Prasad's Response explicitly states that "Prasad is asking the Court to impose a constructive trust on the $500,000 it paid Defendants."  (Doc. 25 at 8).

Under Arizona law, "[a] constructive trust is an equitable remedial device generally used to prevent unjust enrichment."  *Warfield v. Alaniz*, 453 F.Supp.2d 1118, 1134 (D. Ariz. 2006) (citing *Burch & Cracchiolo, P.A. v. Pugliani*, 697 P.2d 674, 678 (Ariz. 1985)).  A constructive trust arises by operation of law when the circumstances under which property was acquired make it inequitable for the one who holds legal title to the property to retain ownership.  *Bates v. Bates*, 400 P.2d 593, 596 (Ariz. Ct. App. 1965).  Thus, through the constructive trust remedy, a court has jurisdiction to reach property in the hands of a "wrongdoer."  *Warren v. Whitehall Income Fund*, 823 P.2d 689, 692 (Ariz. Ct. App. 1991). However, there is no set or unyielding formula in decreeing a constructive trust and courts will do so when a party is under an equitable duty to give another the benefit of property to which he has acquired legal title.  *Chirekos v. Chirekos*, 537 P.2d 608, 609 (Ariz. Ct. App. 1975).

Because imposing a constructive trust on the Defendants is a potential remedy *in the event that Prasad prevails on the merits of an underlying claim*—such as unjust enrichment

1    (Count Seven)—it would be premature for this Court to determine at this stage of the

2    proceedings whether the equitable remedy of constructive trust will be available or necessary

3    at the time that the underlying claim is decided.  Accordingly, the Court declines to address

4    the Defendants' remaining arguments against the imposition of a constructive trust.

5         Therefore, Count Six of Prasad's Complaint will not be dismissed and the Defendants

6    can re-raise their objections if Prasad prevails on an underlying claim and seeks to impose

7    a constructive trust in addition to a more traditional form of judgment.

8         **H.    Count Seven (Unjust Enrichment of All Defendants) Sufficiently States a Claims for Relief**

9

10        The Defendants argue that "[u]njust enrichment is not a cause of action, but a

11   restitution theory," that Prasad "cannot assert a claim under a specific contract

12   simultaneously with a claim for unjust enrichment," and that Prasad's "Complaint fails at all

13   five elements."  (Doc. 16 at 12-13).

14        First, although "unjust enrichment" is a theory of restitution, *Restatement (Third) of*

15   *Restitution & Unjust Enrichment* § 1(b) (2011), "unjust enrichment" is also undoubtably a

16   valid cause of action under Arizona law.  *See, e.g.*, *Murdock-Bryant Const., Inc. v. Pearson*,

17   703 P.2d 1197, 1201-02 (Ariz. 1985) (discussing the common-law and Arizona precedents

18   supporting the existence of a claim of restitution for unjust enrichment).

19        Second, the Defendants correctly, but inappositely, assert that "the existence of a

20   contract specifically governing the rights and obligations of each party precludes recovery

21   for unjust enrichment."  (Doc. 16 at 13) (quoting *USLife Title Co. of Arizona v. Gutkin*, 732

22   P.2d 579, 584 (Ariz. Ct. App. 1986)).  At this stage of the proceedings, however, the

23   existence of a contract between Prasad and Flat Irons has not been proven; a contract has

24   only been *alleged* by Prasad (Doc. 1 at ¶ 72) and, critically, its existence is *disputed* by the

25   Defendants (Doc. 16 at 8-9; Doc. 25 at 4).  Prasad is entitled to plead alternate and

26   inconsistent claims.  Fed. R. Civ. P. 8(d)(2)-(3).

27

28

1    Third, without specificity,[11] the Defendants argue that Prasad's Complaint fails to

2    allege sufficient facts to meet the elements of a claim of unjust enrichment.  A claim of unjust

3    enrichment under Arizona law has five elements: "(1) an enrichment, (2) an impoverishment,

4    (3) a connection between the enrichment and impoverishment, (4) the absence of justification

5    for the enrichment and impoverishment, and (5) the absence of a remedy provided by law."

6    *Freeman v. Sorchych*, 245 P.3d at 936 (citing *City of Sierra Vista v. Cochise Enters.*, Inc.,

7    697 P.2d 1125, 1131-32 (Ariz. Ct. App. 1984)).  The first, second, third, and fourth elements

8    are clearly met because Prasad has alleged that the Defendants induced Prasad to transfer a

9    $500,000 advance payment to the Defendants specifically for purchasing urea, on Prasad's

10   behalf, that was never delivered.  (Doc. 1 at ¶¶ 21-23, 30-31, 56, 59-69; Exs. C-D, H, X, Z-

11   CC).  The fifth element, the absence of a remedy provided by law, is contingent upon the

12   resolution on the merits of Prasad's alternate claims.  Consequently, at this stage of the

13   proceedings, it would be premature for this Court to determine whether Prasad is or will be

14   able to avail itself of other legal remedies.

15       Accordingly, the Court finds that Prasad has alleged facts sufficient to state a claim

16   of unjust enrichment against all Defendants.  Therefore, Count Seven of Prasad's Complaint

17   will not be dismissed.

18   ### I.    Count Eight (Common Law Fraud and Conspiracy to Commit Fraud by All Defendants) Sufficiently States a Claim for Relief

19       The Defendants primarily argue that Prasad has "fail[ed] to assert facts with sufficient

20   particularity under Fed. R. Civ. P. 9(b)."  (Doc. 16 at 13-17).  Rule 9(b) "requires the

21   identification of the circumstances constituting fraud so that the defendant can prepare an

22   adequate answer from the allegations."  *Bosse v. Crowell Collier & MacMillan*, 565 F.2d

23   602, 611 (9th Cir. 1977).  The Ninth Circuit has "interpreted Rule 9(b) to mean that the

24   pleader must state the time, place, and specific content of the false representations as well

25

26

27       [11] The Defendants argument, in its entirety, is that "Prasad's Complaint fails at all five

28   elements, especially the requirement that [Prasad] allege that no remedy is provided by law
     for breach of contract."

1   as the identities of the parties to the misrepresentation." *Schreiber Distributing Co. v.*

2   *ServWell Furniture Co., Inc.*, 806 F.2d 1393, 1401 (9th Cir. 1986) (citing *Semegen v.*

3   *Weidner*, 780 F.2d 727, 731 (9th Cir. 1985).

4       Here, Prasad's Complaint incorporates (Doc. 1 at ¶ 100) at least fifty-eight paragraphs

5   of factual allegations (*id.* at ¶¶ 12-70) and twenty-nine exhibits (*id.* at Exs. A-CC) into Count

6   Eight.   Whenever applicable, each of these paragraphs clearly identifies the time or date,

7   place, specific content of the false representations, and the identities of the parties to the

8   representation.   (*See, e.g.*, Doc. 1 at ¶ 47).[12]   Prasad's allegations provide notice of the

9   alleged misrepresentations sufficient for the Defendants to adequately defend against

10  Prasad's allegations.   Prasad is not required to put on summary judgment type evidence to

11  support its allegations.   All that is required at this stage is that Prasad "state with particularity

12  the circumstances constituting fraud." Fed. R. Civ. P. 9(b).   Prasad has satisfied Rule 9(b).

13      Secondarily, the Defendants argue, without any specificity, that Prasad has "failed to

14  allege the required elements under Arizona law as to each and every Defendant." (Doc. 16

15  at 17).   In order to maintain an action for fraud under Arizona law, a plaintiff must

16  sufficiently plead: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's

17  knowledge of its falsity or ignorance of its truth, (5) the speaker's intent that it be acted upon

18  by the recipient in the manner reasonably calculated, (6) the hearer's ignorance of its falsity,

19  (7) the hearer's reliance on its truth, (8) the right to rely on it, and (9) a consequent and

20  proximate injury.   *Nielson v. Flashberg*, 419 P.2d 514, 517-18 (Ariz. 1966).   In order to

21  determine whether the elements are present, a court looks to the face of the complaint.

22  *Stewart v. Phoenix Nat'l Bank*, 64 P.2d 101, 105 (Ariz. 1937); *see also Spudnuts, Inc. v.*

23

24      [12] Paragraph Forty-Seven of the Complaint alleges: "On October 3, 2012, Carlile sent

25  Prasad an email that stated, "Attached please find the contract . . . we have entered into with
    Hebei . . . 5000MT per month is earmarked for [Prasad]. . . . The first shipment of 1400MT

26  is anticipated to arrive at the end of October."   *See* Exhibit R attached hereto, the contents
    of which are incorporated herein by reference.   To its detriment, Prasad relied on Carlile's

27  statements, but upon information and belief, Carlile knew those statements were false and

28  intended to deceive Prasad."

*Lane*, 641 P.2d 912, 914 (Ariz. Ct. App. 1982) ("[a]lthough no particular language is necessary in pleading fraud, the elements constituting fraud must be found when considering the pleading as a whole").

Here, even a cursory reading of the Complaint reveals that Prasad has alleged all nine elements for each defendant.  For example, Carlile and Miller, acting on behalf of Flat Irons, are both alleged to have emailed Prasad stock internet photos and, with the intent to deceive Prasad, claimed that the photos were actually of a urea sample and the Chinese urea factory that they claimed would be supplying urea for Prasad.  (Doc. 1 at ¶¶ 53-54; Exs. V-W).  Prasad further alleges that Prasad reasonably relied on Carlile and Miller's false statements and photographs to Prasad's detriment.  (*Id.* at ¶¶ 53-55).  With regard to Keylon, Prasad has alleged that, to its detriment, it relied on Keylon's "repeated[] promise[s to] Prasad" that "Flat Irons would uphold its terms of the agreement" despite knowing the promises were false and intending to deceive Prasad.  (*Id.* at ¶ 50).  Thus, Prasad has alleged particular facts satisfying each of the elements of fraud against each defendant.

Accordingly, the Court finds that Prasad has alleged particular facts sufficient to state a claim of fraud and conspiracy to commit fraud against all Defendants.  Therefore, Count Eight of Prasad's Complaint will not be dismissed.

> **J.     Count Nine (Statutory Fraud (A.R.S. §§ 13-2310, 44-1521, *et seq.*, and 47-2721) by All Defendants) Sufficiently States a Claim for Relief**

As with Count Eight (common law fraud), the Defendants primarily argue that Prasad has "fail[ed] to assert facts with sufficient particularity under Fed. R. Civ. P. 9(b)."  (Doc. 16 at 13-17).  For the reasons described above, Prasad has satisfied Rule 9(b).

The Defendants also argue that Prasad "is not able to allege in its Complaint, and has not alleged in its Complaint, that each and every Defendant ever made a promise or representation to [Prasad]."  (Doc. 16 at 18).  For the reasons explained above, even a cursory reading of Prasad's Complaint reveals that Prasad *has* sufficiently alleged that Keylon, Miller, and Carlile, purportedly acting on behalf of Flat Irons, made misrepresentations to Prasad.  Because the Defendants have not challenged the sufficiency of Prasad's allegations

for any other element of statutory fraud under Arizona Revised Statutes ("A.R.S.") sections 13-2310, 44-1521, *et seq.*, or 47-2721, the Court finds that Prasad has alleged particular facts sufficient to state a claim of fraud against all Defendants.

The Defendants only other argument is that Prasad has not alleged that the alleged misrepresentations were "in connection with the sale or advertisement of merchandise," as required by the Arizona Consumer Fraud Act ("ACFA"), A.R.S. section 44-1521, *et seq.* (Doc. 16 at 18).  The ACFA, however, defines "merchandise" as "any objects, wares, goods, commodities, intangibles, real estate, or services."  A.R.S. § 44-1521(5).  Urea fertilizer clearly falls within the category of "any objects," "goods," or "commodities," and thus is "merchandise" for the purposes of the ACFA.  Consequently, the ACFA is an appropriate vehicle for Prasad's statutory fraud claim.

Accordingly, the Court finds that Prasad has alleged particular facts sufficient to state a claim of statutory fraud, under A.R.S. sections 13-2310, 44-1521, *et seq.*, and 47-2721, against all Defendants.  Therefore, Count Nine of Prasad's Complaint will not be dismissed.

### K.   Count Ten (Civil Conspiracy of Defendants Miller, Carlile, and Keylon) Sufficiently States a Claim for Relief

As with Count Eight (common law fraud), the Defendants primarily argue that Prasad has "fail[ed] to assert facts with sufficient particularity under Fed. R. Civ. P. 9(b)."  (Doc. 16 at 13-17).  Assuming for purposes of this Order that civil conspiracy must be pleaded with particularity, for the reasons described above, Prasad has satisfied Rule 9(b).

The Defendants also argue that Prasad has failed to state a civil conspiracy claim because Prasad "must do more than point at Defendants and accuse all of them to have conspired somehow, somewhere, at some time, for some purpose."  (Doc. 16 at 17).  Prasad *has* done more.  As explained above, Prasad's Complaint identifies with sufficient particularity the who, what, when, and where of each alleged act or misrepresentation by the Defendants.  (*See* Doc. 1 at ¶¶ 12-70; Exs. A-CC).

In Arizona, there is no independent tort of conspiracy.  *Hansen v. Stoll*, 636 P.2d 1236, 1242 (Ariz. Ct. App. 1981).  "A civil conspiracy requires an underlying tort which the

alleged conspirators agreed to commit." *Baker ex rel. Hall Brake Supply, Inc. v. Stewart Title & Trust of Phoenix, Inc.*, 5 P.3d 249, 259 (Ariz. Ct. App. 2000).  Thus, it is a derivative tort.  *Rowland v. Union Hills Country Club*, 757 P.2d 105, 110 (Ariz. Ct. App. 1988).   In this case, Prasad has sufficiently alleged the underlying torts of fraud, conversion, and tortious interference with contractual relations.  To the extent that Prasad has not explicitly pleaded that the Defendants formed an agreement to participate in the fraud, the Court finds that such an agreement can be readily inferred from the allegations in the Complaint.  For example, Miller, Carlile, and Keylon were each CCed on various emails containing alleged misrepresentations that were sent to Prasad by the other alleged co-conspirators (Doc. 1 at Exs. N-O, V, Y) and each defendant, himself, allegedly made numerous misrepresentations to Prasad concerning the same central and material topic: Flat Irons expertise, experience, and ability to supply the urea. Furthermore, these misrepresentations were often in response to a separate communication between Prasad and another alleged co-conspirator (*see, e.g.*, Doc. 1 at ¶¶18-22; Exs. A-C), thereby indicating that the Defendants were coordinating their misrepresentations.  Thus, Prasad has alleged conspiracy and an agreement to participate in the torts of fraud, conversion, and tortious interference with contractual relations.

Accordingly, the Court finds that Prasad has alleged particular facts sufficient to state a claim of civil conspiracy against Miller, Carlile, and Keylon.  Therefore, Count Ten of Prasad's Complaint will not be dismissed.

### L.    Count Eleven (Tortious Interference with Contractual Relations by All Defendants) Sufficiently States a Claim for Relief

The Defendants argue that Prasad's claim is "unsupported," "does not state the elements for interference with contract required by Arizona law," does not allege that "every Defendant knew about the alleged contract with Guysuco," "makes no allegation that the relationship with Guysuco was 'breached' or 'terminated,'" and that "a change in position by Guysuco is not alleged."  (Doc. 16 at 18-20; Doc. 25 at 12-13).

Under Arizona law, the five elements of a prima facie case for tortious interference with contractual relations are: "(1) existence of a valid contractual relationship, (2)

1   knowledge of the relationship on the part of the interferor, (3) intentional interference

2   inducing or causing a breach, (4) resultant damage to the party whose relationship has been

3   disrupted, and (5) that the defendant acted improperly." *Wells Fargo Bank*, 38 P.3d 12, 31,

4   ¶ 74.

5         Prasad satisfies the first element, existence of a valid contractual relationship, by

6   alleging that it had a contract with Guysuco. (*See, e.g.*, Doc. 1 at ¶ 29; Exs. G, I, M).  To

7   satisfy the second element, knowledge of the relationship on the part of the interferor, Prasad

8   alleges that Carlile (and therefore Flat Irons), received multiple emails discussing the

9   relationship. (*See id.* at Exs. G, I, M).  Prasad alleges Keylon's knowledge because Prasad

10  "CCed" Keylon on an email related to the Guysuco contract. (*Id.* at Ex. N).  Prasdad alleges

11  Miller's knowledge because Miller explicitly acknowledged the Guysuco contract in his

12  emails to Prasad. (*See, e.g.*, *id.* at Exs. O, Y).  Despite the Defendants' insistence, Prasad

13  need not allege that Mrs. Miller, Mrs. Carlile, and Mrs. Keylon each knew about Prasad's

14  contract with Guysuco because Prasad is not alleging that Mrs. Miller, Mrs. Carlile, and Mrs.

15  Keylon interfered with the relationship between Prasad and Guysuco.[13]  Thus, Prasad has

16  satisfactorily alleged the second element against all relevant defendants.

17        Prasad satisfies the third element, intentional interference inducing or causing a

18  breach, by consistently alleging that the Defendants' statements and representations to Prasad

19  regarding Flat Irons' ability and undertakings to source the urea "were false and intended to

20  deceive Prasad." (*E.g.*, *id.* at ¶ 51).  For example, in response to Prasad's email notifying

21  Flat Irons that a urea sample Flat Irons provided did not conform with Guysuco's order (*id.*

22  at ¶ 52; Ex. U), Carlile allegedly emailed "a photo of the sample [Carlile] will send" (*id. at*

23  ¶ 53; Ex. V).  Prasad has alleged, however, that the photo was "not a picture of the sample[,]

24  but instead was[] a stock photograph copied and pasted from the internet." (*Id.* at ¶ 53).  If

25  true—and the Court assumes the allegation is true for the purposes of this motion to

26

27        [13] As explained above, Prasad has properly named Jane Doe Miller, Jane Doe Carlile,
     and Jane Doe Keylon as defendants, for purposes of recovering assets from any community
28   property, where ever a claim has been properly made against their husbands.

dismiss—then Carlile's conduct (and the other similar conduct by the remaining Defendants) clearly satisfies the intentional interference component of this third element. Indeed, in their Reply, the Defendants appear to agree: "[t]he Complaint does allege that Defendants interfered and that such interferences 'constitute tortious interferences.'" (Doc. 25 at 13). The Defendants argue, however, that Prasad does not satisfy the remainder of the third element because Prasad has not alleged "a change in position by Guysuco." (*Id.*). The Defendants' argument is simply untrue; Prasad has explicitly alleged that "due to Flat Irons' failure to perform its agreement to supply Prasad with the [urea], Prasad was financially unable to purchase the [urea] from another supplier . . . [and, a]s a result, Prasad lost its contract with Guysuco, defaulted on the security bonds and [Prasad's] personal guarantee," and been successfully sued by Guysuco for breach of contract. (*Id.* at ¶ 69). Guysuco's alleged actions against Prasad unequivocally demonstrate a change in position by Guysuco from Prasad's contractual counter-party to an adversarial litigant. Thus, Prasad has satisfactorily alleged the third element.

Prasad satisfies the fourth element, resultant damage to the party whose relationship has been disrupted, by alleging that Prasad's breach of its contract with Guysuco resulted in "the financial destruction of Prasad's business." (*Id.* at ¶¶ 69, 70). Prasad satisfies the fifth element, that the defendants acted improperly, by alleging that the Defendants made numerous statements and representations that the Defendants knew to be "false and intended to deceive Prasad," (*e.g.*, *id.* at ¶ 51), which clearly constitute "improper" actions. Consequently, the Court finds that Prasad's allegations satisfy all five elements of a tortious interference with contractual relations claim against all Defendants.[14]

---

[14] In their Motion to Dismiss, the Defendants also argue that, as a matter of law, the claim cannot be made against the non-corporate defendants because "[c]oporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the *corporation's* contract." (Doc. 16 at 19-20) (emphasis added). In their Reply, however, the Defendants abandon this argument, apparently realizing its irrelevance when Prasad has claimed tortious interference with the contract between Prasad and Guysuco, not Prasad and Flat Irons. (Doc. 25 at 11-13).

1     Accordingly, the Court finds that Prasad has alleged facts sufficient to state a claim

2    of tortious interference with contractual relations against all Defendants.  Therefore, Count

3    Eleven of Prasad's Complaint will not be dismissed.

4           **M.**    **Count Twelve (RICO (18 U.S.C. § 1964(a) and (c)) Unlawful Acts**
                  **and Prohibited Activities of All Defendants) Insufficiently States**

5                  **a Claim for Relief**

6     The Defendants argue that Prasad has not alleged a "pattern" of racketeering because

7    "[o]ne alleged breach of an alleged contract does not amount to 'two acts of racketeering

8    activity.'" (Doc. 16 at 20).

9     The Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

10    U.S.C. §§ 1961 *et seq.*, provides a private cause of action for "[a]ny person injured in his

11    business or property by reason of a violation of section 1962 of this chapter."  18 U.S.C. §

12    1964(c).  Section 1962(c) of RICO makes it "unlawful for any person employed by or

13    associated with any enterprise engaged in, or the activities of which affect, interstate

14    commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's

15    affairs through a pattern of racketeering activity or collection of unlawful debt."  Thus, to

16    state a claim under section 1962(c), "a plaintiff must allege (1) conduct, (2) of an enterprise,

17    (3) through a pattern, and (4) of racketeering activity."  *Jarvis v. Regan*, 833 F.2d 149,

18    151–52 (9th Cir. 1987) (internal citations omitted).

19     Section 1961 of RICO defines "racketeering activity" by reference to a list of specific

20    crimes and statutes.  18 U.S.C. § 1961(1).  That section further states that a "'pattern of

21    racketeering activity' requires at least two acts of racketeering activity" within a 10-year

22    period. 18 U.S.C. § 1961(5).  The acts must be related and also must amount to or pose a

23    threat of continued criminal activity.  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239

24    (1989).  Furthermore, with regard to continued criminal activity, "'[c]ontinuity' is both a

25    closed—and open-ended concept, referring either to a closed period of repeated conduct, or

26    to past conduct that by its nature projects into the future with a threat of repetition."  *Id.* at

27    241.  Thus, because "Congress was concerned in RICO with long-term criminal conduct,"

28    "[p]redicate acts extending over a few weeks or months and threatening no future criminal

1  conduct do not satisfy this requirement." *Id.* at 242.

2  Moreover, the Ninth Circuit has held that allegations of one scheme, perpetrated
3  against a single victim, are typically insufficient to establish a pattern for civil RICO
4  purposes. *See Sever v. Alaska Pulp Co.*, 978 F.2d 1529, 1535 (9th Cir. 1992) (affirming
5  dismissal of RICO claims where "although [plaintiff] alleges a number of 'acts,'
6  [defendant's] collective conduct is in a sense a single episode having the singular purpose of
7  impoverishing [plaintiff], rather than a series of separate, related acts," and pointing to the
8  importance of the fact that "there was but a single victim involved"); *Jarvis v. Regan*, 833
9  F.2d 149, 153-54 (9th Cir. 1987) (affirming dismissal of a RICO claim where the alleged
10 pattern consisted of three acts of mail and wire fraud committed by legal aid organizations
11 in obtaining a single federal grant); *Schreiber Distrib. Co. v. Serv Well Furniture Co.*, 806
12 F.2d 1393, 1399 (9th Cir. 1986) (affirming dismissal of RICO claims where alleged pattern
13 consisted of fraudulently obtaining a single shipment of goods). Additionally, "[a]ctivity that
14 lasts only a few months is not sufficiently continuous." *Howard v. Am. Online Inc.*, 208 F.3d
15 741, 750 (9th Cir. 2000). And though there is no bright-line rule, *see Allwaste, Inc. v. Hecht*,
16 65 F.3d 1523, 1528 (9th Cir. 1995), the Ninth Circuit has previously noted an absence of
17 cases finding continuity where all of the alleged predicate acts occurred within a year. *See*
18 *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366-67 (9th Cir. 1992) (collecting cases).

19 Here, the alleged pattern of racketeering activity in Prasad's Compliant includes an
20 unspecified number of "indictable acts of mail and wire fraud within the meaning of 18
21 U.S.C. §§ 1341 and 1343, respectively."[15]  (Doc. 1 at ¶ 120). Because neither Prasad's
22 Complaint nor his Response attempts to carefully distinguish each of these "racketeering
23 activities," the Court views them merely as part of a single alleged scheme to deceive and

24

25     [15] The Court understands "indictable acts of mail and wire fraud" to refer to Prasad's
26 allegations that, via regular mail, email, telephone, and wire transfers, the Defendants
   knowingly and intentionally made numerous false representations and statements with the
27 intention to deceive Prasad. (Doc. 1 at ¶¶ 115, 120; *see, e.g.*, *id.* at ¶¶ 18, 20, 24, 30-32, 38,
28 40, 43, 45, 47, 50-51, 53, 55, 57).

defraud Prasad in relation to the alleged urea supply contract.  That is, after the initial alleged fraud that deceived Prasad into wiring the $500,000 advance payment, the remaining "acts of mail and wire fraud" are simply evidence of the Defendants' original deception and fraud. Prasad's Complaint includes no indication of any additional fraudulent or deceptive demands for new or increased payment that might give rise to an additional distinct "racketeering activity."  In sum, the single alleged predicate act of fraud or deception related to the urea supply contract is not sufficient to establish a pattern of racketeering activity under RICO. *See* 18 U.S.C. § 1961(5).

Even assuming here that the alleged acts of mail and wire fraud constitute distinct predicate acts for purposes of RICO, those acts do not sufficiently establish a pattern of racketeering activity.  Rather, this "collective conduct is in a sense a single episode having [a] singular purpose." *Sever*, 978 F.2d at 1535.  That is, both the alleged mail and wire fraud were simply steps taken to further the Defendants' single alleged fraud scheme, which it targeted only at Prasad.  Moreover, the fact that all of the alleged predicate acts here occurred within just a few months further undermines a finding of closed-ended continuity. *See, e.g.*, *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1418 (9th Cir. 1991) ("[A]n eight-month period of fraudulent activity directed at a single entity does not constitute a pattern, absent a threat of future criminal acts.").

With regard to a threat of future criminal conduct, the acts alleged in the amended complaint are clearly all surrounding a single event—the fraud or deception allegedly perpetrated against Prasad through the urea supply contract with Flat Irons. *See Sever*, 978 F.2d at 1535-36.  There is no suggestion of other potential victims or that the Defendants will continue to commit acts of mail and wire fraud against Prasad now that Prasad has terminated the business relationship.  In other words, there is no indication that the alleged "racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," which would "supply the requisite threat of continuity." *See H.J. Inc.*, 492 U.S. at 242.

In sum, the Court finds that Prasad has failed to identify which, if any, distinct and valid predicate acts of "mail and wire fraud" constitute a pattern of racketeering activity

1    within the meaning of 18 U.S.C. § 1961(5).   Consequently, the Court finds that Count

2    Twelve falls short of the Rule 8 pleading requirements and, therefore, is insufficient to state

3    a claim.   Accordingly, the Court grants the Defendants' Motion to Dismiss with respect to

4    Count Twelve of the Complaint.

5            **N.      Count Thirteen (AZRAC (A.R.S. § 13-2314.04) Unlawful Acts and
                       Pattern of Unlawful Activities of Miller, Carlile, and Keylon)
6                      Insufficiently States a Claim for Relief**

7            Both the Defendants and Prasad advance identical arguments opposing and supporting

8    Prasad's federal RICO (Count Twelve) and state AZRAC (Count Thirteen) claims (*see* Doc.

9    16 at 20-21; Doc. 24 at 15-16; Doc. 25 at 13-14), except that Prasad has alleged that the

10   underlying predicate acts for the AZRAC claim are "theft, extortion, intentional or reckless

11   fraud relating to theft and/or a scheme or artifice to defraud . . . and/or participating in a

12   criminal syndicate" (Doc. 1 at ¶ 124).   Like section 1961 of the federal RICO statute,

13   AZRAC requires evidence of a "pattern of racketeering activity."   A.R.S. § 13-

14   2314.04(T)(3); 18 U.S.C. §§ 1961(5).   The Court has previously compared the "pattern of

15   racketeering activity" requirements under RICO and AZRAC and found that, insofar as is

16   relevant here, the statutes operate identically. *Aviva USA Corp. v. Vazirani*, — F. Supp. 2d.

17   —, 2012 WL 4514039, *20 (D. Ariz. Oct. 2, 2012) ("The Arizona Court of Appeals

18   concluded in *Lifeflite* . . . that the Arizona legislature intended that AZRAC's definition of

19   'pattern of racketeering activity' should be interpreted in accordance with the U.S. Supreme

20   Court's interpretation of that phrase in the federal statute.") (citing *Lifeflite Med. Air*

21   *Transport, Inc. v. Native Am. Air Servs., Inc.*, 7 P.3d 158, 160-62, ¶¶ 7-15 (Ariz. Ct. App.

22   2000)).

23          Additionally, just like in Prasad's federal RICO claim, neither Prasad's Complaint nor

24   his Response attempts to carefully distinguish each of these potential "racketeering

25   activities." Therefore, for reasons identical to those discussed above, the Court finds Prasad

26   has failed to identify a pattern of unlawful activity as required by AZRAC.   Consequently,

27   the Court finds that Count Thirteen falls short of the Rule 8 pleading requirements and,

28   therefore, is sufficient to state a claim.   Accordingly, the Court grants the Defendants'

1 Motion to Dismiss with respect to Count Thirteen of the Complaint.

2
3

### IV.   DEFENDANT'S 12(e) MOTION FOR A MORE DEFINITE STATEMENT OF THE CLAIMS IN THE COMPLAINT AND LEAVE FOR PRASAD TO AMEND

4 Additionally, as an alternative to their Motion to Dismiss, the Defendants have moved

5 for a more definitive statement of the claims in the complaint under Rule 12(e).  (Doc. 16 at

6 21).  The Court will deny the Defendants' Rule 12(e) motion with respect to Counts One,

7 Two, Five, Six, Seven, Eight, Nine, Ten, and Eleven because the Court has found that these

8 Counts sufficiently state a claim for relief as pleaded in Prasad's Complaint.

9

### V.   CONCLUSION

10 Based on the foregoing,

11 **IT IS ORDERED** granting in part and denying in part Defendants' Motion to Dismiss

12 (Doc. 16).  Count Three is dismissed with prejudice.  Counts Four, Twelve, and Thirteen are

13 dismissed without prejudice.  The Motion is denied in all other respects.

14 **IT IS FURTHER ORDERED** that the stipulation for extension of time to answer

15 (Doc. 26) is granted in part and denied in part as follows: it is granted to the limited extent

16 that all Defendants shall answer the Complaint by June 21, 2013.

17 DATED this 20th day of May, 2013.

18
19
20
21

_____
James A. Teilborg
Senior United States District Judge

22
23
24
25
26
27
28